## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

JENNIFER ANDERSEN,       )
                            )
      Plaintiff,       )
                            )
                            )
      v.          )     CIVIL NO. 3:11-cv-250-JAG
                            )
MICHAEL J. ASTRUE,      )
      Commissioner of Social Security,  )
                            )
      Defendant.      )

## REPORT AND RECOMMENDATION

Jennifer Andersen ("Plaintiff") is a college graduate who was born in 1973 and has previously worked as a guidance counselor, executive assistant, daycare worker and drugstore cashier. She alleges that she suffers from fibromyalgia and bipolar disorder. On November 21, 2007, Plaintiff applied for Social Security Disability ("DIB") under the Social Security Act (the "Act") with an alleged onset date of June 19, 2007. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for DIB benefits. The Appeals Council subsequently denied Plaintiff's request for review on March 4, 2011. Plaintiff now challenges the ALJ's denial of DIB benefits, asserting that the ALJ did not properly evaluate her treating physicians' opinions and her credibility.

In his decision, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, limited to entry level, unskilled work with little decision making. (R. at 16.) In doing so, the ALJ rejected Plaintiff's statements concerning the frequency and severity of her symptoms and functional limitations as not credible, because they were not supported by

the objective evidence on the record. (*See* R. at 16-18.) The ALJ also rejected the opinions of Plaintiff's treating physicians, because they were inconsistent with treatment notes and Plaintiff's admitted activities of daily living ("ADL"). (R. at 18-19.) Plaintiff alleges that the ALJ erred, because his finding was contrary to legal standards and not supported by substantial evidence when he evaluated Plaintiff's treating physicians' opinions and Plaintiff's credibility. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 12-20.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. MEDICAL HISTORY

Plaintiff's main complaints consisted of fibromyalgia and bipolar disorder. Because the opinions of Plaintiff's treating physicians and Plaintiff's credibility are at issue, Plaintiff's testimony describing her ADLs and the medical records pertaining to her primary two medical conditions are relevant.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

A.      **Medical Records Pertaining to Fibromyalgia**

On July 16, 2007, Plaintiff visited her family doctor, Clifton A. Sheets, M.D., for a

pregnancy screen. (R. at 346-47.) Dr. Sheets noted that Plaintiff had no complaints, was stable

musculoskeletally with no connective tissue, had no neurological symptoms and was emotionally

stable. (R. at 346.)

On September 5, 2007, Rosalia M. Lomeo, M.D., Plaintiff's rheumatologist, noted that

Plaintiff had fibromyalgia and bipolar disorder. (R. at 451.) Dr. Lomeo noted that Plaintiff quit

her job and was starting a new one, but opined that Plaintiff might not be able to sit or stand for

prolonged periods of time. (R. at 451.) When Plaintiff was six or seven months pregnant, she

complained to Dr. Lomeo that she was tired, did not sleep well and had diffuse myalgias. (R. at

450.) Dr. Lomeo noted diffuse muscle tender points and deep tendon reflexes of 2+. (R. at 450.)

In May 2008, Plaintiff complained of thumb pain when picking up her baby and Dr. Lomeo

noted positive bilateral Finkelstein's test indicating DeQervain's tenosynovitis. (R. at 515.) Dr.

Lomeo also noted that Plaintiff did not have joint synovitis and declined injections and

medications for pain. (R. at 515.)

On July 23, 2008, Plaintiff met with Kenneth J. Accousti, M.D., an orthopedic surgeon.

(R. at 550.) Dr. Accousti noted that Plaintiff did not have osteoarthritis in her knees, her

physical examination was unremarkable, she had full strength and she had good range of motion.

(R. at 550.) Plaintiff had some tenderness over her body and some joint arthritis in her right

shoulder. (R. at 550.) Dr. Accousti prescribed physical therapy and a home exercise program.

(R. at 516, 550.)

On August 14, 2008, Plaintiff was treated by Joseph Marietta, M.D., a family doctor, to

discuss her blood work. (R. at 556.) Plaintiff had no complaints, no back pain, no myalgias and

3

no neurological symptoms. (R. at 556.) Dr. Marietta noted that Plaintiff had mild depression. (R. at 556.)

On August 22, 2008, Plaintiff was treated by Alan Pacinki, M.D. (R. at 552-53.) Dr. Pacinki indicated that Plaintiff was suffering from post-partum depression and that her bipolar disorder was "'fairly under control.'" (R. at 552.) He noted soft tissue spasms in the neck, shoulders, wrists, hips, knees and ankles. (R. at 552-53.) Plaintiff was diagnosed with chronic fatigue syndrome and fibromyalgia, and it was recommended that she exercise. (R. at 553.)

On September 4, 2008, Plaintiff indicated that she had minimal fatigue and her knees felt better after physical therapy. (R. at 527.) Plaintiff reported that her shoulder hurt, especially when she lifted her daughter. (R. at 527.) A few weeks later, Plaintiff noted that she no longer had constant knee pain and her strength improved. (R. at 536.) Plaintiff stated that she had pain when she carried her child on the stairs. (R. at 536.) At the end of September, Plaintiff noted that she had no pain in her shoulder and had no increase in pain when performing exercise. (R. at 541.) In October 2008, Plaintiff reported that she did a lot over the weekend and her shoulder hurt. (R. at 545.) Plaintiff had a cortisone injection that helped ease her pain. (*See* R. at 547.)

**B.    Medical Records Pertaining to Plaintiff's Mental Health**

One of Plaintiff's treating physicians was psychiatrist Sumana Suresh, M.D., who met with Plaintiff every few months for medication management. (*See, e.g.*, R. at 287-88.) Plaintiff had never been psychiatrically hospitalized. (R. at 288.) On August 14, 2007, Dr. Suresh noted that Plaintiff appeared "anxious," was two months pregnant and was unable to find a job. (R. at 287.) Plaintiff was also diagnosed with attention deficit disorder in December 2008. (R. at 611.) In a letter dated August 7, 2009, Dr. Suresh wrote that Plaintiff's diagnosis was "mood disorder"

and that Plaintiff felt anxious and depressed, could not concentrate and did not sleep well. (R. at 625.)

Plaintiff also regularly attended counseling sessions with her licensed professional counselor, Bonnie Neely, M.Ed., LPC, NCC. (*See* R. at 385-96.) Ms. Neely noted that Plaintiff's level of impairment was moderate. (*See* R. at 618-23.) Between 2007 and 2008, Plaintiff told Ms. Neely that she had resigned from her job but did not have another job, she was trying to have another baby, she was looking for a full-time or part-time job, she had job interviews, she was stressed financially, she had given up on her job search because she was too far along with her pregnancy and she had back pain during her pregnancy. (R. at 367-69, 371-72, 374, 373, 395-98.) Ms. Neely also noted that Plaintiff was going on job interviews in June 2008, had two job interviews in November 2008, was working as a mystery shopper in December 2008, was picking up students after school for money in April 2009 and was busy mystery shopping and picking up children from school in May 2009. (R. at 576-77, 597, 595, 619-21.)

## C.   The Treating Physician Opinion of Dr. Lomeo, Plaintiff's Rheumatologist

In a letter dated October 2, 2007, Dr. Lomeo wrote: "I follow Ms. Andersen for fibromyalgia syndrome. She is totally disabled and is permanently unable to work for gainful employment." (R. at 363.)

On January 27, 2008, Dr. Lomeo again wrote a letter opining on Plaintiff's medical condition. (R. at 449.) Dr. Lomeo noted that Plaintiff's symptoms of severe fatigue and myalgias had increased over the six years that Dr. Lomeo had treated Plaintiff. (R. at 449.) Dr. Lomeo opined that Plaintiff's bipolar disorder "hinder[ed] any improvement in [Plaintiff's]

fibromyalgia." (R. at 449.) Dr. Lomeo opined that Plaintiff could not sit or stand for long periods of time or carry more than five pounds due to her pain. (R. at 449.)

Dr. Lomeo opined that Plaintiff's increased myalgias and fatigue had contributed to Plaintiff's inability to perform job related activities, because Plaintiff had to rest more on some days and it had been extremely hard "to accomplish all she ha[d] to do to maintain full time employment." (R. at 449.) Continuing, Dr. Lomeo noted that Plaintiff was having trouble completing tasks of normal living, as she had to take frequent rests throughout the day to complete activities for herself, her husband and her son. (R. at 449.) Dr. Lomeo concluded that Plaintiff could not complete her activities of normal living "and work for gainful employment." (R. at 449.)

On January 28, 2008, Dr. Lomeo completed a Fibromyalgia Impairment Questionnaire. (R. at 457-462.) Dr. Lomeo listed Plaintiff's impairments as diffuse myalgia with a symptom of fatigue and noted that Plaintiff's prognosis was poor with at least twelve tender points. (R. at 456-57.) Dr. Lomeo described Plaintiff's pain as constant all over her body. (R. at 458-59.) Dr. Lomeo opined that Plaintiff could sit, stand or walk for zero to one hour at a time, would need to get up and move around for five minutes every five minutes, could only lift five pounds occasionally and was incapable of tolerating a low stress job, because stress aggravated her myalgia and fatigue. (R. at 460-61.) Dr. Lomeo also opined that Plaintiff would be absent from work more than three times a month. (R. at 461.)

On September 11, 2009, Dr. Lomeo wrote another letter opining that Plaintiff was totally disabled and unable to engage in any meaningful employment. (R. at 638.) Dr. Lomeo noted that Plaintiff suffered from at least twelve tender points and was subject to constant pain all over

her body. (R. at 638.) Dr. Lomeo also noted that Plaintiff's symptoms had increased over the

past several years, despite treatment. (R. at 638.)

Further, Dr. Lomeo opined that Plaintiff could sit, stand or walk for less than an hour at a

time and needed to move around for five minutes after every five minutes of sitting. (R. at 638.)

Dr. Lomeo opined that Plaintiff could occasionally lift five pounds, would need five minute

breaks to rest every five minutes and would be absent from work more than three times a month.

(R. at 638.) Dr. Lomeo wrote that Plaintiff was incapable of low stress work, because the stress

aggravated her myalgias which then contributed to her anxiety. (R. at 638.) Finally, Dr. Lomeo

noted that Plaintiff "must avoid" temperature extremes, noise, fumes, gases, humidity, dust,

heights, pushing, pulling, kneeling, bending and stooping. (R. at 638.)

**D.      The Treating Physician Opinion of Dr. Caiafa, Plaintiff's Chiropractor**

On February 18, 2008, Dr. Caiafa wrote a letter noting that Plaintiff has had a chronic

pain condition in her lower back and neck since he began treating her on June 7, 2004. (R. at

469.) Dr. Caiafa noted that Plaintiff had shown only a minor improvement from her treatments

and opined that Plaintiff had "a chronic recurring condition that will continue to deteriorate over

time." (R. at 469.) Due to her condition, Dr. Caiafa opined that Plaintiff was "unable to work to

the level and capacity she would normally be able to if she didn't suffer from this chronic

condition." (R. at 469.)

**E.      The Opinion of Ms. Neely, Plaintiff's Therapist**

On January 15, 2008, Ms. Neely completed a Mental Status Evaluation Form, indicating

that she had seen Plaintiff one to two times a month since January 20, 2003. (R. at 380.) Ms.

Neely wrote that Plaintiff had a long history of depression and saw a psychiatrist for medication.

(R. at 380.) Ms. Neely noted that Plaintiff needed to isolate herself often to increase her energy,

slept too much, had constant pain from fibromyalgia, had constant fatigue and could not pick up her three-year-old son. Ms. Neely reported that Plaintiff had missed many days at work because she had low energy and felt overwhelmed. Plaintiff had also changed jobs a few times since she became pregnant with her first child, because she felt her positions were increasingly stressful. (R. at 381.)

Although Ms. Neely thought Plaintiff's frequent leg movement was due to anxiety, Plaintiff instead complained of joint and muscle pain in her legs and neck. (R. at 382.) Ms. Neely observed that Plaintiff had an above average IQ and became overwhelmed before she completed a task, but was able to perform calculations and abstract reasoning when her energy level was adequate. (R. at 383.) Ms. Neely noted that Plaintiff's energy level rapidly depleted when she was under daily stress, which made her ability to concentrate, complete tasks and think deteriorate. (R. at 383.)

On May 12, 2008, Ms. Neely completed a Psychiatric/Psychological Impairment Questionnaire. (R. at 505-12.) Ms. Neely noted Plaintiff's depression, anxiety and fibromyalgia diagnoses and indicated that Plaintiff had a GAF[2] of 50. (R. at 505.) Ms. Neely wrote that, with rest, physical therapy and support, Plaintiff could attend to her daily activities of living and manage her household chores and family responsibilities. (R. at 505.) Ms. Neely also noted Plaintiff's panic attacks, decreased energy and generalized persistent anxiety. (R. at 506.) Ms. Neely indicated that she had not performed any testing, but rather had based her diagnoses on patient reports and clinical assessments. (R. at 506.)

---

[2] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002).

Ms. Neely marked that Plaintiff did not require any hospitalization, but that Plaintiff's symptoms and functional limitations were reasonably consistent with Plaintiff's physical and emotional impairments. (R. at 507.) Ms. Neely also marked most of Plaintiff's functional activities as mildly, moderately or markedly limited. (R. at 508-10.) Ms. Neely noted that Plaintiff experienced episodes of deterioration or decompensation at work that required her to withdraw from situations. These episodes forced Plaintiff to leave work, not go into work or close her door at work to limit stress. (R. at 510.) Ms. Nelly listed Plaintiff's medications as Zoloft, Wellbutrin, Ambien and Motrin, and noted that Plaintiff could have been on more-effective medication had she not been breast feeding. (R. at 510.)

Ms. Neely opined that Plaintiff's depression and anxiety drained her energy, which caused Plaintiff to have difficulty dealing with stress and ultimately exasperated Plaintiff's fibromyalgia pain. (R. at 511.) Continuing, Ms. Neely opined that Plaintiff was capable of handling a low amount of stress and noted that she was educated, intelligent, articulate and able to manage her own household duties when her energy was good and stress remained low. (R. at 511.) She concluded that Plaintiff would likely be absent from work about two to three times a month. (R. at 512.)

Three months later, on September 11, 2008, Ms. Neely completed a Mental Status Evaluation Form. (R. at 568.) Ms. Neely noted that Plaintiff spent most of her day sleeping and caring for her five-month-old baby and her four-year-old son when he was not in preschool, and that Plaintiff could not care for both children on a daily basis as a result of her chronic fatigue and chronic pain. Plaintiff's husband helped with the children when he was home. (R. at 569.) Ms. Neely opined that Plaintiff was not effective in maintaining her day-to-day household and that her ability to manage her household, childcare and work outside the home had "deteriorated

by about 60-70% over the past [two] years." (R. at 569.) Ms. Neely opined that Plaintiff's work and daily routine stress almost incapacitated Plaintiff. (R. at 571.) Finally, Ms. Neely noted that she had never performed psychological testing with Plaintiff. (R. at 571.)

**F.     The Non-treating Physician Opinions of the State Agency Experts**

On March 18, 2008, William Amos, M.D., reviewed Plaintiff's claim and completed a form indicating that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and push or pull objects. (R. at 474.) Dr. Amos indicated that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. at 475-6.)

Dr. Amos noted that Plaintiff was impaired with fibromyalgia and summarized Plaintiff's medical notes indicating that Plaintiff had tender points, but complained of little discomfort. (R. at 478.) Dr. Amos summarized Plaintiff's ADLs, which included taking her son to daycare, sleeping, watching television, reading, caring for her son, vacuuming, washing clothes, caring for seven animals and preparing meals. (R. at 478.) Continuing, Dr. Amos noted that Plaintiff was "depressed because [she was] unable to work and do normal things without pain" and wore a brace on her hands when needed. (R. at 478.) Finally, Dr. Amos determined that Dr. Lomeo's January 2008 opinion was not consistent with all of the evidence in the record, because Plaintiff could carry more than five pounds. (R. at 478-79.)

On March 31, 2008, Yvonne Evans, Ph.D., reviewed Plaintiff's record and completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. (R. at 480-98.) Dr. Evans noted that Plaintiff had depression, anxiety and bipolar disorder. (R. at 484, 486.) Dr. Evans marked that Plaintiff had moderate restriction of activities of daily living,

moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. at 492.) Dr. Evans also marked that the evidence did not establish the presence of the "C" criteria. (R. at 493.)

In the Functional Capacity Assessment, Dr. Evans did not mark any of the functions above "moderately limited" and marked many of the functions as "not significantly limited." (R. at 495-96.) Dr. Evans noted that Plaintiff completed college, was on medication, had a normal intellect and memory and was stable emotionally and intellectually with no psychotic symptoms. (R. at 497.) Dr. Evans summarized Plaintiff's record and noted that Plaintiff had given up on her job search in November 2007, because she was far along in her pregnancy and that Plaintiff did not sleep well due to fatigue incurred while she was pregnant. (R. at 497.)

Dr. Evans noted that Plaintiff could understand, retain and follow simple job instructions, carry out short and simple instructions, complete a normal workweek without exacerbating her psychological symptoms, interact appropriately with the public and function in production oriented jobs requiring little independent decision making. (R. at 498.) Dr. Evans opined that Plaintiff was able to "manage the mental demands of many types of jobs not requiring complicated tasks" and could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. at 498.) As a result, Dr. Evans determined that Plaintiff was capable of simple, non-stressful work with limited social interaction. (R. at 498.)

On October 27, 2008, John Kalil, Ph.D., affirmed that Plaintiff was able to meet the mental demands of a competitive workplace in a simple, non-stressful work environment with limited social interaction. (R. at 582.) Dr. Kalil also noted that Plaintiff's bipolar disorder was

fairly under control, Plaintiff's functional status was improving with a moderate impairment level and that Plaintiff reported pain that affected her ability to function. (R. at 582.)

On October 27, 2008, Luc Vinh, M.D., completed a Physical Residual Functional Capacity Assessment. (R. at 583-89.) Dr. Vinh marked that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and push or pull objects. (R. at 584.) Dr. Vinh indicated that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. at 585-86.) Dr. Vinh summarized Dr. Amos's notes in his March 18, 2008 opinion and noted that Plaintiff was observed as having diffuse muscle tender points, severe soft tissue spasm on her neck and mild laxity soft tissue in the arm, shoulders, wrists, hips, knees and ankles. (R. at 589.) While Plaintiff had help from her parents caring for her children and reported severe pain that affected her ability to function, Dr. Vinh determined that Plaintiff's statements were partially credible based on the evidence in the record. (R. at 589.)

G.     Plaintiff's Testimony

At the hearing, Plaintiff testified that she had two children under five, three dogs and four cats. (R. at 26.) She sent her four-year-old son to daycare, "because it was really too much on [her] with both" children at home all day. (R. at 26.) Plaintiff testified that she drove her son to school every day, could interact with her son's daycare providers and could pick up and hold her twenty-two pound baby. (R. at 26, 28-29, 34.) Plaintiff testified that while she was the primary caregiver to her child, she had help from her mother and mother-in-law. (R. at 30.) Plaintiff testified that she napped for two to three hours a day while her daughter was sleeping. (R. at 38.)

Plaintiff testified that she could prepare simple meals for the kids, wash dishes, make her bed, perform limited grocery shopping and follow the contents of a television program. (R. at 41-42.) She stated that she had trouble concentrating for long periods of time and could only read a book for twenty to thirty minutes at a time. (R. at 43.) Plaintiff stated that she had debilitating headaches two to three times in a week and would take Tylenol to ease the pain. (R. at 44.)

Plaintiff further testified that her fibromyalgia primarily affected her shoulders, lower back and hands. (R. at 27.) She stated that she needed to move around every ten to fifteen minutes and that she could walk between twenty to thirty minutes at a time. (R. at 27-28.) Plaintiff had flare-ups at least four times a week for a few days at a time, but would continue to drive and pick up her child. (R. at 29-30.) Plaintiff's medications included Wellbutrin, Celexa and Neurontin. (R. at 29-31.)

Plaintiff testified that she stopped working in June 2007, because she was taking off at least two days a month because of tiredness, pain and depression. (R. at 31.) Plaintiff stated that she had attempted to commit herself at one time. (R. at 32-33.) Plaintiff stated she had not been to pain management therapy. (*See* R. at 39-40.)

## H.      Evidence Submitted After the Date of the ALJ's Decision

Plaintiff submitted additional evidence to the Appeals Council, including additional medical records dated after the ALJ's decision from Dr. Suresh and Dr. Lomeo and an additional opinion from Plaintiff's treating psychiatrist, Nicholas Emiliani, M.D. (R. at 642-58.) On November 6, 2010, more than one year after the ALJ's decision, Dr. Emiliani completed a Psychiatric/Psychological Impairment Questionnaire. (R. at 642-49.) Dr. Emiliani noted that he had treated Plaintiff every two months from August 2002 through December 2009. (R. at 642.)

He noted that Plaintiff had bipolar affective disorder, fibromyalgia and chronic fatigue syndrome diagnoses, a GAF of 40 and a poor prognosis. (R. at 642.) Dr. Emiliani also noted Plaintiff's poor memory, sleep and mood disturbance, loss of intellectual ability, pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, decreased energy, manic syndrome, persistent irrational fears, generalized persistent anxiety and hostility. (R. at 643.) Dr. Emiliani marked that Plaintiff did not require any hospitalization, but that Plaintiff's symptoms and functional limitations were reasonably consistent with Plaintiff's physical and emotional impairments. (R. at 644.)

Dr. Emiliani marked Plaintiff's ability in almost every mental activity listed as markedly limited. (R. at 645.) He noted that Plaintiff had experienced episodes of deterioration or decompensation at work, because of extreme anxiety and restlessness as well as an inability to assess or interpret regular social cues and interactions. (R. at 647.) Dr. Emiliani opined that Plaintiff could not follow reasonable directions for a long period of time, because she became easily confused and distracted. (R. at 647.) Finally, Dr. Emiliani noted that Plaintiff was a very sensitive person with a large amount of anxiety and emotional instability, and he opined that Plaintiff was incapable of even "low stress," because she was impulsive and confused with significantly impaired judgment that reduced her basic and residual stress tolerance. (R. at 648.) Dr. Emiliani based his opinion on clinical findings. (R. at 643.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on November 21, 2007, claiming disability due to fibromyalgia, headaches, depression, severe back pain, high cholesterol and bipolar disorder with an alleged onset date of June 19, 2007. (R. at 118-19, 154.) The Social Security Administration

14

("SSA") denied Plaintiff's claims initially and on reconsideration.[3] (R. at 53-54.) On September 9, 2009, Plaintiff testified before an ALJ. (R. at 12.) On October 6, 2009, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 12-21.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on March 4, 2011, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-5.)

### III. QUESTIONS PRESENTED

Was the Commissioner's rejection of the opinions of Plaintiff's treating physicians supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

Does Plaintiff's "new" evidence support a "Sentence Six" remand?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a

---

[3] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[4] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[5] based on an assessment of the claimant's residual functional capacity ("RFC")[6] and the "physical and mental demands of

---

[4] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[5] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[6] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

17

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5).  The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE").  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.*  (footnote omitted).

# V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since June 19, 2007. (R. at 14.) At step two, the ALJ determined that Plaintiff was severely impaired from depression/bipolar disorder, a generalized anxiety disorder and fibromyalgia. (R. at 14.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 15-16.) More specifically, the ALJ summarized Plaintiff's testimony that she slept most of the day, drove her son to and from daycare, cared for her eighteen-month-old daughter, performed light household chores, took care of her seven pets, spent time with family, interacted with her son's daycare teachers and had trouble remembering to take her medication. (R. at 15.)

Next, the ALJ determined that Plaintiff had the RFC to perform light work limited to entry level, unskilled work with little decision making. (R. at 16.) The ALJ summarized Plaintiff's written statements indicating that she was unable to bend, stand, walk or concentrate for long periods of time; took hours-long naps daily; took medication for her depression, fibromyalgia and pain; and stopped working in June 2007, because she was absent from work for at least two days a month. (R. at 16.) Plaintiff further testified that her fibromyalgia flared-up four times a week; she took care of her eighteen-month-old daughter; she drove her son to and from daycare; she could sit or stand about fifteen minutes at a time and could walk about thirty minutes a few times a week; she could lift her 22-25 pound child; and her mother and mother-in-law helped her during the day. (R. at 17.) Plaintiff also rated her pain as a seven or eight on a scale of ten; testified that her medication gave her side-effects; had steroid and cortisone injections; and attended physical therapy when she could afford it. (R. at 17.)

19

The ALJ then summarized the medical notes from Dr. Lomeo, which reflected treatment of Plaintiff's fibromyalgia, diffuse myalgias and fatigue. (R. at 17.) Dr. Lomeo indicated at least twelve tender points on Plaintiff's body and noted that Plaintiff's fatigue has increased despite treatment. (R. at 17.) Dr. Lomeo opined that Plaintiff could sit, stand or walk for less than an hour, could occasionally lift and carry five pounds, must take frequent rest breaks during the day and was incapable of low stress work. (R. at 17.) She also opined that Plaintiff was totally disabled and unable to engage in any meaningful work. (R. at 17.) The ALJ also summarized notes from Drs. Pacinki and Caiafa. (R. at 17.)

Next, the ALJ reviewed the patient notes from Ms. Neely, a licensed professional counselor. (R. at 17.) Ms. Neely rated Plaintiff's GAF at 50, noted that Plaintiff was capable of low stress work and, while she had a low energy level, she was able to manage her household and parenting duties. (R. at 18.) While Plaintiff was educated, intelligent and articulate, Ms. Neely opined that she had a marked limitation in her ability to maintain attention, concentrate for extended periods, perform activities within a schedule, work in coordination with or proximity to others without being distracted, complete a normal workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number of rest periods. (R. at 17.) Ms. Neely did not perform any diagnostic or psychological testing; her findings were based on Plaintiff's reports and her clinical assessments. (R. at 18.)

The ALJ determined that the conservative nature of Plaintiff's medical care, her admitted activities of daily living and her functional capabilities diminished her credibility regarding the frequency and severity of her symptoms. (R. at 18.) While Plaintiff was diagnosed with fibromyalgia, depression and a mood disorder, and suffered from anxiety, fatigue and generalized pain, Plaintiff's fibromyalgia was treated with medication and physical therapy. (R.

20

at 18.) Her treatment was conservative in nature and did not require hospitalizations. (R. at 18.)
The ALJ noted that Plaintiff's psychiatric treatment had also been conservative with medication
and that Plaintiff's GAF rating of 50 was determined based on Plaintiff's report of her symptoms
and limitations. (R. at 18.) Finally, the ALJ noted Plaintiff's ADLs, including her ability to
drive and take care of her children, perform light household chores, prepare meals and interact
with her son's daycare teachers. (R. at 18.)

The ALJ then reviewed the opinion evidence from state agency medical and
psychological consultants, who concluded that Plaintiff had the RFC for light work because she
was able to meet the basic mental demands of competitive work on a sustained basis and to
perform simple, non-stressful work with limited social interaction. (R. at 18.) The ALJ assigned
these opinions significant weight, because they were consistent with the objective findings. (R.
at 18-19.)

The ALJ assigned Dr. Lomeo's assessment limited weight, because Dr. Lomeo's
conclusions were not consistent with Plaintiff's admitted activities of daily living, functional
capabilities or testimony. (R. at 19.) More specifically, Dr. Lomeo's opinions that Plaintiff
could sit, stand or walk for less than an hour, could occasionally lift and carry five pounds, must
take frequent breaks throughout the day and was incapable of low stress work were contradicted
by the record. (*See* R. at 19.)   Additionally, the ALJ noted that Dr. Lomeo's opinion that
Plaintiff was totally disabled and unable to engage in work was reserved to the Commissioner.
(R. at 19.)

Because Ms. Neely's assessment of Plaintiff was based on subjective reports of
symptoms and limitations, not on laboratory or diagnostic testing, the ALJ gave Ms. Neely's
opinion limited weight. (R. at 19.) More specifically, the ALJ determined that Ms. Neely's

"conclusions as to [Plaintiff's] ability to function were not even consistent with [her] admitted daily living and functional capabilities." (R. at 19.)

At step four, the ALJ assessed that Plaintiff was able to perform her past relevant work as an executive assistant, a guidance counselor, a daycare worker or a cashier. (R. at 19.) The ALJ determined that, based on Plaintiff's current age of 34, high school education and ability to communicate in English, there were a significant number of jobs in the national economy that Plaintiff could perform. (R. at 20.) As a result, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act. (R. at 21.)

Plaintiff asserts that the ALJ erred in determining that she was not disabled. (*See* Pl.'s Mem. at 21.) More specifically, Plaintiff complains that the ALJ failed to follow the treating physician rule and that substantial evidence did not exist to support the ALJ's weighing of the experts. (Pl.'s Mem. at 12-17.) Plaintiff also asserts that the ALJ failed to properly evaluate Plaintiff's credibility and that his ultimate decision that Plaintiff lacked credibility was not supported by substantial evidence. (Pl.'s Mem. at 18-20.) Finally, Plaintiff asserts that her new evidence should result in a Sentence Six remand. (*See* Pl.'s. Mem. at 17 n.27.) Defendant asserts that the ALJ gave little weight to the treating physicians' opinions, because they were not supported by any of the medical evidence in the record. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 15-19.) Defendant also argues that substantial evidence supported the ALJ's decision. (Def.'s Mem. at 19-26.)

A.    **The ALJ properly evaluated the opinions of Plaintiffs' treating physicians and his decision was supported by substantial evidence.**

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with other substantial evidence in the record. *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. § 404.1527(d)(3)-(4), (e); *Mastro*, 270 F.3d at 178 (treating physician opinions may be assigned less weight when there is "persuasive contrary evidence").

If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the

23

physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

Plaintiff complains that the ALJ did not properly weigh the opinions of her treating physicians. (*See* Pl.'s Mem. at 13-14.) Continuing, Plaintiff argues that the "ALJ's succinct discussion of the evidence relating to [Plaintiff's] fibromyalgia" was insufficient. (Pl.'s Mem. at 13.) Plaintiff further asserts that Dr. Lomeo's opinion should have been given controlling weight and Ms. Neely's opinion should have been assigned a higher weight. (Pl.'s Mem. at 15, 16-17.)

First, the ALJ succinctly and fully summarized Plaintiff's patient notes on fibromyalgia, which, quite frankly, Plaintiff provided little evidence to support her claim of disability based on fibromyalgia. The ALJ determined that Dr. Lomeo's opinions were not consistent with Plaintiff's admitted activities of daily living. (R. at 19.) Conversely, he assigned greater weight to the non-treating state agency physician opinions, as they were consistent with the objective findings. (R. at 18.) Dr. Lomeo's opinions were not afforded controlling weight, because they were inconsistent with the record. Dr. Lomeo's opinions greatly reduced Plaintiff's abilities to a point lower than what Plaintiff admitted that she could perform. For example, Plaintiff testified at the hearing that she could hold and carry her eighteen-month-old child, who was at least twenty-two pounds; Dr. Lomeo opined that Plaintiff could only occasionally lift and carry five pounds. (*Compare* R. at 26 *with* R. at 460.) Under either the *Craig* standard or 20 C.F.R. sec. 404.1527(d), the ALJ correctly assigned lower weight to Dr. Lomeo's opinion.

24

Next, in assigning Ms. Neely's opinion less weight, the ALJ noted that Ms. Neely's opinions about Plaintiff's ability to function were not consistent with Plaintiff's admitted activities of daily living. (R. at 19.)  In fact, Ms. Neely's two 2008 opinions were inconsistent with each other.  On May 12, 2008, Ms. Neely opined that Plaintiff could manage her household duties when her energy was good and stress remained low. (R. at 511.)  Four months later, however, Ms. Neely opined that Plaintiff was not effective in maintaining her household. (R. at 569.)  In contrast, Ms. Neely's notes between these two dates indicated that Plaintiff was going on job interviews; Plaintiff's own testimony indicated that she was caring for her baby. (*See* R. at 26, 576-77.)  As such, Ms. Neely's opinions were not supported by substantial evidence in the record; the ALJ was correct in affording her opinions a lesser weight.

Since its decision in *Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992), the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2).  That is exactly what occurred here.  None of the opinions provided by Plaintiff's treating physicians or counselor were consistent with the medical evidence provided in the record or with Plaintiff's own admitted daily activities.  As such, the ALJ did not err when he afforded lesser weight to the opinions that Plaintiff submitted.

**B.      The ALJ properly analyzed Plaintiff's credibility.**

Next, Plaintiff attacks the ALJ's credibility analysis. (Pl.'s Mem. at 19-20.)  Plaintiff argues that fibromyalgia can only be treated conservatively and that the ALJ overinflated Plaintiff's admitted activities of daily living. (Pl.'s Mem. at 19-20.)  Plaintiff also asks this Court to consider her "honorable work history" when analyzing her credibility. (Pl.'s Mem. at 20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13.

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

In assessing Plaintiff's credibility, the ALJ determined that Plaintiff's treatment for her fibromyalgia and psychiatric disorders had been conservative. (R. at 18.) Plaintiff's maladies were indeed treated conservatively for their conditions. Plaintiff took a limited amount of medication for her bipolar disorder, Celexa and Neurontin for her fibromyalgia and admitted to

26

taking Tylenol for her pain. (*See* R. at 510, 29-31, 44.) Plaintiff also admitted that her bipolar disorder was fairly under control. (R. at 552.)

The ALJ noted that the Plaintiff's ADLs included caring for her children and performing light household chores. (R. at 18.) Although Plaintiff complained of diffuse pain and severe fatigue, Plaintiff testified that she cared for her eighteen-month-old child and seven pets throughout the day and drove her four-year-old to daycare. (*See* R. at 26.) The ALJ did not mischaracterize Plaintiff's ADLs and, in fact, understated them by not noting Plaintiff's admitted part-time work or discussing Plaintiff's attempts to obtain a full-time job. (*See* R. at 576-77, 597, 595, 619-21.) Finally, while the Plaintiff argues that her work history should have been considered in the ALJ's credibility analysis, the issue cuts both ways, as Plaintiff's attempts at procuring work throughout her purported disability period could have easily undercut her credibility.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). In the present case, the ALJ's determination of Plaintiff's credibility was consistent with the entire record. The Court therefore gives deference to that determination.

27

C.    **Plaintiff's case does not merit a "Sentence Six" remand.**

In determining whether the ALJ's decision was supported by substantial evidence, a

district court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99

F.3d 635, 638 n.5 (4th Cir. 1996) (citing *U.S. v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15

(1963); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438

F.2d 1157 (4th Cir. 1970) (noting that reviewing courts are restricted to the administrative record

in determining whether the decision is supported by substantial evidence).

Although the Court cannot consider evidence that was not presented to the ALJ, the Act

allows a court to remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). The

first is a "sentence four" remand, which provides that the "court shall have power to enter, upon

the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security with or without remanding the cause for a

rehearing. *Id.* The second is a "sentence six" remand, which provides that the court "may at any

time order additional evidence to be taken before the Commissioner of Social Security, but only

upon a showing that there is new evidence which is material and that there is good cause for the

failure to incorporate such evidence into the record in a prior proceeding." *Id.*; *see also Borders*

*v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (a reviewing court may remand a case on the basis

of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to

the determination of disability at the time the application was first filed and not be merely

cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit

the evidence before the Commissioner; and (4) the claimant must present to the remanding court

a general showing of the nature of the new evidence.). Because Plaintiff has offered new

28

evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

New evidence must relate to the determination of disability *at the time the application was first filed*, and it must not concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984) (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982); *see also Borders*, 777 F.2d at 955. Evidence must also be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted).

The majority of the medical records from Ms. Neely and Dr. Lomeo provided after the ALJ issued his decision relate to Plaintiff's condition *after* the ALJ's decision. As a result, those medical records would show a subsequent deterioration — if there was one — and do not merit a Sentence Six remand.

Dr. Emiliani's opinion would not have affected the ALJ's decision. Like Dr. Lomeo's opinions, Dr. Emiliani's opinion would not be afforded controlling weight under the treating physician rule in *Craig*, as Dr. Emiliani noted that his opinion was based on clinical findings, not diagnostic techniques. (R. at 643.) Additionally, there are no medical records supporting Dr. Emiliani's opinion. Medical records from his consolations with Plaintiff were not included in the record and his opinion, much like Ms. Neely's, inflate Plaintiff's mental condition. Finally, Dr. Emiliani stopped treating Plaintiff in 2009, but wrote an opinion in 2010. Plaintiff does not show good cause for why she waited to obtain this opinion *after* the ALJ's decision. Because

29

Plaintiff's new evidence would not affect the ALJ's decision, the Court recommends that decision be affirmed.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: June 15, 2012